# Berberich's Estate.

*Pledgor and pledgee—Pledge of stock—Sale without notice—Conversion—Rights of pledgee—Rights of pledgor—Attorney and client—Estoppel—Equitable doctrines.*

1. One of the conditions of a pledge requires that before any sale be made of the pledged property, to answer for any default of the pledgor, the pledgee shall give notice to the pledgor, or someone standing in interest with him, in order that opportunity may be afforded him to continue the pledge if he may desire. Upon continued default, the pledgee may sell, but even then only upon notice that sale will be made, so that opportunity be again afforded the pledgor to protect himself and his property if he can, by redemption or otherwise.

2. Where a stock broker agrees to carry stocks upon margins, an agreement is implied that such stock shall not be sold in case there is danger of the exhaustion of the margin, until additional margins shall have been applied for and a reasonable time afforded for furnishing the same, and a sale of the stock without notice to the owner is a breach of the broker's contract.

3. An attorney for an administratrix without express authority to bind the administratrix, or the estate she represents, has no implied authority arising out of the relation in which he stands to authorize a broker to sell stocks pledged by the administratrix's decedent, without notice to the administratrix.

4. A firm of stock brokers with whom certain stocks had been pledged as security for loans to the owner demanded additional margin of the owner; before the entire amount demanded had been supplied the owner died and thereafter the brokerage firm sold from time to time the stocks which had been pledged with them; no notice was given of the contemplated action to any party interested in the estate, but after certain sales had been made the brokers notified decedent's widow of what they had done and continued to make further sales; shortly after the appointment of decedent's widow as administratrix a representative of the firm saw her attorney who said "it is up to you to protect yourselves" and thereafter all the stock was sold, leaving decedent's estate largely indebted to the firm, for which indebtedness they claimed at the audit of the administratrix's account. The Orphans' Court decided that the administratrix should have repudiated the transaction as soon as she heard about it and that by her silence she was estopped to say that the transaction was wrongful, and allowed the claim. *Held,* (1)· that the act of the brokerage firm in converting the securities was illegal; (2) that the administratrix was not estopped to complain of the transaction; (3) that her attorney had no authority to authorize the firm to sell the securities, if his remark to their representative could be so construed; (4) that the decree should be reversed.

5. If a transaction is condemned under the force of legal rules, it cannot receive a more favorable consideration in a court of · equity on account of any hardship to particular parties.

Argued Jan. 16, 1917.    Appeal, No. 204, Jan. T., 1916, by Kathryn Berberich, Administratrix of the estate of Herman Berberich, deceased, from decree of O. C. Philadelphia Co., Oct. T., 1915, No. 294, dismissing exceptions to adjudication, in Estate of Herman Berberich, De-

ceased. Before BROWN, C. J., MESTREZAT, POTTER, STEWART and FRAZER, JJ. Reversed.

Exceptions to adjudication. Before ANDERSON, J.

The opinion of the Supreme Court states the facts.

The court dismissed the exceptions in an opinion by GEST, J. Kathryn Berberich, administratrix of the estate of Herman Berberich, deceased, appealed.

*Errors assigned* were in dismissing the exceptions.

*James J. Breen,* for appellant.—A pledgee of stock before selling the pledgor's property must give reasonable notice to the pledgor, or if he be dead, to his representative: Diller v. Brubaker, 52 Pa. 498; Esser v. Linderman, 71 Pa. 76; Davis v. Funk, 39 Pa. 243; Conyngham's App., 57 Pa. 474; Rosenblatt v. Weinman, 230 Pa. 536; Bell v. Mills, 123 Fed. Repr. 24; Buffalo German Insurance Company v. Third National Bank of Buffalo, 29 N. Y. App. Div. 137; Hess et al. v. Rau, Ex'trx., 95 N. Y. 359.

A sale without prior notice is a conversion and the pledgee cannot recover a balance due from the pledgor or his estate: Sterling's Est., 254 Pa. 155; Sproul v. Sloan, 241 Pa. 284; Darr, Admr., v. Fidelity Title & Trust Co., 243 Pa. 591.

There was no duty on the part of the administratrix to repudiate sales of stock made illegally: Penna. Schuylkill Valley R. R. Co. v. Reading Paper Mills, 149 Pa. 18; Lehman v. Murtoff, 7 Pa. Superior Ct. 485; Rhawn v. Edge Hill Furnace Co., 201 Pa. 637; Hill v. Epley, 31 Pa. 331; Chapman v. Chapman, 59 Pa. 214; Hepburn v. McDowell, 17 S. & R. 383; Larkins's App., 38 Pa. 457; Eldred v. Hazlett's Administrator, 33 Pa. 307; Hoffman v. Bloomsburg & Sullivan Co., 157 Pa. 174.

Counsel for the administratrix cannot and did not waive the legal duty imposed upon the pledgee to give

notice of the sale to the pledgor's representative : Locker
v. Rice, 8 Pa. D. R. 404; Gray v. Howell, 205 Pa. 211;
McGarry v. McGarry, 9 Pa. Superior Ct. 71; Brockley
v. Brockley, 122 Pa. 1; Stilley v. McNeal, 219 Pa. 533;
Rowland v. Slate, 58 Pa. 196; Tompkins v. Woodford,
1 Pa. 156.

*Frederick J. Knaus,* for appellees.—There was no ad-
ministratrix or any other legal representative of the es-
tate of the decedent to whom notice could have been
given and who might have redeemed the securities at the
time of the sale.

A sudden, unexpected and unforeseen train of circum-
stances arose creating an emergency requiring immediate
action; under such circumstances it was not necessary
to give notice.

OPINION BY MR. JUSTICE STEWART, March 19, 1917 :

For several years prior to July, 1914, William Hastie
Smith, Jr., & Co., a firm of stock brokers in the City of
Philadelphia, had carried an account with one Herman
Berberich.  The firm from time to time purchased stocks
and bonds on the latter's order, advancing their own
money for that purpose and charging him with the
amount so advanced, plus their regular commission and
interest.  The bonds and stocks so purchased remained
pledged in the hands of the brokers as security for their
advancements and charges, together with whatever mar-
gin might be deposited by Berberich pursuant to demand
made by the firm for additional security against a declin-
ing market.  Under date of June 30, 1914, the firm ren-
dered a quarterly statement of account to Berberich—
the last one rendered—showing an indebtedness due
from him of $56,806.17, for which it held as security
enumerated bonds and stocks purchased on his order.
On 16th of July following, upon the order of Berberich,
the firm purchased for him certain additional stocks in-
creasing his indebtedness to $58,406.17, subject to a

credit of $440 for certain dividends collected by the firm, which reduced the claim to $57,966.17. Thus the account stood when towards the end of July, 1914, the firm called on Berberich for additional margin. This demand he attempted to comply with by mailing to the firm two checks drawn by himself, one for $1,000, and one for $2,000, against deposits ample to meet the demand. These checks reached the firm on Saturday, July 25th, and were promptly deposited. The day following—Sunday—Berberich met his death in the surf at Wildwood, N. J. On Monday, the two checks passed through the clearing house; the one for $1,000 was paid, the other was refused by the bank for the reason as written on the back, "maker deceased." On the 11th of August following, letters of administration on the estate of Herman Berberich were granted to his widow, Kathryn Berberich, the accountant and appellant. On the audit of her account as stated by herself, William Hastie Smith, Jr., & Co., the above named firm of brokers, presented its claim as above indicated, reduced by the $1,000 check which had been paid, and demanded payment out of balance in the hands of the administratrix. The correctness of the account was not disputed; that is to say, there was no contention that it did not correctly exhibit the several stock transactions between Berberich and the firm. The dispute arose out of transactions on the part of the firm after the death of Berberich. On the day following the death of the latter, Monday, July 27th, there occurred a rapid decline in stock values because of the warlike situation abroad. The margin demanded by Berberich not having been met in full because of his sudden death, and being apprehensive of a still further decline in market values, the firm, without notice to any one in interest, proceeded to sell sufficient of the pledged securities of Berberich to furnish it with what it believed a reasonable margin for its own protection. These sales made on the day following Berberich's death, while furnishing sufficient margin to the brokers, resulted in

heavy loss to Berberich's estate. The firm, by letter dated the same day addressed to the widow of Berberich, advised her of the fact that they were carrying a large amount of stock for her husband; that he had sent a check for $2,000 to be placed to his credit which had been refused by the bank on which it was drawn, and added, "this reduced his credit with us to such an extent, and the stock market was so panicky on account of the war scare, that we felt it wise to reduce his holdings, and so sold 1,100 shares as per enclosed notice. It is well that we did so, as the prices of stocks we sold are much lower to-night.. As soon as you are able to take these matters up with us, we would be glad to call upon you and explain the situation." The stocks reported sold were Philadelphia Electric 100 shares, Lake Superior 600 shares, and Electric Storage 100 shares. Two days thereafter values continued to decline, and the firm sold the following additional securities of Berberich, without notice to any one in interest, Lake Superior 100 shares, Electric Storage 200 shares and Kansas Southern 100 shares, and carried proceeds to Berberich's credit. During the months of September, October and November following, further sales were made without notice to the administratrix of the estate, but of which she was subsequently advised by the firm. This left in the hands of the firm $10,000 in Lake Superior bonds and 775 shares of Lake Superior stock. The total proceeds of sales made amounted to $42,821.74. This credited on Berberich's account left a balance of indebtedness of $14,-144.43, for which claim was made before the auditor. The facts not being in dispute, on this presentation of them, the auditor held (1) that in making the sales in July the claimants acted within their rights and powers; they sold only sufficient to protect themselves, instead of selling out decedent's entire holdings; the prices obtained were higher than those obtainable during the rest of the year, and had they waited longer greater loss would have been occasioned; (2) the claimants imme-

diately notified the wife of the decedent of the action they had taken, and if it was not her duty as widow to repudiate their action, it certainly was her duty to do so as administratrix after her appointment; (3) that as to sales made after appointment, the administratrix through her counsel waived any necessity of notice by directing claimants to protect themselves as best they could. The auditor accordingly awarded to claimants the full amount of their claim as presented. Exceptions having been filed the case was heard by the court in banc, with the result that the exceptions were dismissed and the report of the auditor confirmed. From this decree we have the present appeal by the administratrix of the estate.

In the opinion filed by the court while there is no express dissent from the view taken by the auditing judge in what we have above indicated as the latter's first conclusion, namely, that in making the sales in July the claimants acted within their rights, there is, nevertheless, a refusal to rest the case on any such ground accompanied by this qualified admission, "if the rights of the parties depended simply upon this question, we should probably hold that the stocks were unlawfully converted, and the claimants were liable for the consequent loss." Inasmuch as we are of opinion that the court should have held unqualifiedly that these sales of stock were in law and fact an illegal conversion of the same, and are unable to agree that the reasons assigned by the court are sufficient in law to relieve the claimants from the legal consequences incurred, a brief reference to some well established rules and principles will be here in place. Reduced to its simplest terms, the relation to the parties to this transaction was that of pledgor and pledgee. No special contract between the parties touching the mode or manner of conducting the business that engaged them having been shown, it was necessarily subject to common law rules and principles, and by these their reciprocal rights and obligations must be deter-

mined. Though having certain property rights in the
things pledged, the pledgee had no right of disposal ex-
cept under well defined conditions; and except as these
conditions have been fully met, any sale of the pledge by
the pledgee must be held to be unlawful conversion of
the property. One of these conditions requires that be-
fore any sale be made to answer for any default of the
pledgor, the pledgee shall give notice to the pledgor or
some one standing in interest with him, in order that op-
portunity may be afforded him to continue the pledge if
he may desire. Upon continued default the pledgee may
sell, but, even then, only upon notice that sale will be
made, so that opportunity be again afforded the pledgor
to protect himself and his property if he can, by redemp-
tion or otherwise. Where, as in the present case, there
is a contract to carry stocks upon margin, an agreement,
as part of the contract is implied, that such stocks shall
not be sold, in case there is danger of the exhaustion of
the margin, until additional margins shall have been ap-
plied for and a reasonable time afforded for furnishing
the same. A sale of the stock without notice is a breach
of the contract on the part of the broker. Doubtless
parties may agree that the broker may sell without no-
tice when stocks falling in price show that the margin
does not cover the difference between current rates and
the price paid, but, in the absence of any such agreement,
it would be a breach of good faith and common honesty
to allow the pledgor's property to be sacrificed without
giving him an opportunity to increase his margin and
hold the stock for a favorable change in the market.
This is said in Ritter v. Cushman & Gignoux, 35 How.
Pr. 284, and multiplied cases from our own books may be
found of like effect. We have cited the above case in this
connection more particularly because of what follows
the extract above given. The learned judge there con-
cludes: "I know it is said that fluctuations in the stock
market are so sudden and unexpected that there is not
time to give notice; but these abrupt transitions in the

value of stocks are and have been well known for many years, and should be provided for by brokers and those with whom they deal. If no such provision is made parties must abide by the rules of law." In Bispham's Equity, P. L. (8th Ed.) 359, it is said, "The right to sell upon notice, however, is one in the exercise of which great deal of care is required; and the pledgee may be held responsible if he does not strictly follow all the requirements of the law by which his rights are fenced." In Diller v. Brubaker, 52 Pa. 498, following Davis v. Funk, 39 Pa. 243, and Sitgreaves v. Farmer's Bank, 49 Pa. 359; it is expressly declared that the pledgor cannot appropriate the pledge in satisfaction of the debt intended to be secured at his option, unless in pursuance of a contract to that effect, nor sell it without giving notice to the pledgor of his intention to do so, in order that he may have an opportunity to redeem it if he desire. To the same effect is the late case of Sproul v. Sloane, 241 Pa. 284. In the present case it is not pretended that any notice whatever was even attempted to be given. We need not delay to consider whether Berberich was in actual default on July 27th when the sales were made, with respect to the margin that had been demanded of him. It may be conceded that for the few hours, if so much, intervening between the return of the $2,000 check and the actual sale, he was technically in default. What right did that circumstance give the appellee? None whatever but the right to sell upon notice given. Instead of giving such notice, or attempting to give it, the appellee with the single purpose of providing itself with additional margin on a rapidly declining market, precipitately threw the pledged certificates upon the market and sold them as it would have sold its own property for which it was answerable to none but itself. The fact that Berberich was lying dead at the time neither justified nor excused such precipitate haste. What matters it that notice to Berberich was made impracticable by his death? Such circumstance, or any other happening

that would interfere with the pledgor observing the strictly requirements of the law, as said in the case above cited, should be provided against by the brokers and those with whom they deal, and if no such provision be made, parties must abide by the rules of law. A familiar rule is that when notice is required to be given, if the party to be served cannot be found, a notice delivered at his last known place of residence is sufficient. So it might have been here, and who can say that such notice, had it been given, would not have arrested the sale? However this may be, it was the bounden duty of the appellee to give whatever notice a reasonable regard for the rights of those in interest would have suggested. Failing in this, sales made on the 27th and 29th of July must be held to have been an illegal conversion of the pledged property.

Avoiding in a way this material inquiry, the learned court rests its affirmance of the auditing judge's report on purely equitable considerations; first, that it was the duty of the widow, at least after she had qualified as administratrix, to repudiate the transaction, and not having done so, she cannot now claim that the sales were unlawful and seek to hold the brokers for the highest market value of the stocks thereafter, or the market price at the date of the trial. The opinion proceeds, "she did nothing at all, and it would be in our opinion very inequitable to allow her to set off against this claim damages which we calculate would approximate $6,700." This is to impose on the widow and administratrix a duty which the law nowhere recognizes. In her own right the widow had no standing to interfere; as the legal representative of the estate of the pledgor she had a perfect right, as against one who had illegally converted the property of the estate, to stand quiet until the latter made demand. The wrongdoer was without standing to compel her to make election between a ratification of his wrongful act or a repudiation of it. It is quite enough to know that no ratification by her is alleged.

We are not here dealing with a question arising out of a contract, but one arising out. of an illegal transaction.

Another consideration advanced by the court is that —"The widow's conduct was entirely inconsistent with her present claim; for when shortly after her appointment as administratrix one of the claimant's firm saw her attorney in reference to the account and to a check of the decedent's drawn before his death, but returned from the bank by reason of his death, the attorney said in effect, 'It is up to you to protect yourselves.' Naturally the brokers considered that this remark was virtually a declination to do anything to protect the account and an authority to the brokers to act in the future as they thought best, and we entirely agree with the auditing judge that this was a waiver of the notice of future ·sales. This was moreover at the time when the attorney for the estate should have given the brokers notice that they would be held liable for their failure to give notice of the prior sales. He who will not speak when he should, shall not speak when he would. The circumstances were such as to impose on the administratrix or her representative the duty in equity to inform the brokers that they would be held to strict accountability for what they had done." To the doctrine here asserted we cannot agree. Minds may differ as to what might fairly be understood from the remark of the counsel to the appellees when he was called upon; but, aside from that, it is of no consequence what he said. In his capacity as counsel merely he was without express authority to bind the administratrix, or the estate she represented, neither had he any implied authority arising out of the relation in which he stood. The subject of the conversation had regard to a fixed right in property of the estate, and over that he had no control whatever. Furthermore, it being a fixed right of the estate—the right to notice of a purpose to sell—it could only be waived upon consideration, and none is pretended. The counsel was under no duty to speak out and caution the

appellee against further illegal acts on their part in connection with the property of the estate, or disclose to them what his advice to the administratrix would be with respect to the earlier sales. We repeat, here is no room for the operation of equity. Estoppel could not arise. There is not a particle of evidence that appellees were misled to their hurt by relying upon the representations made by either the administratrix or her counsel. What they did with the stocks remaining on their hands from August to November was just what they had already done with the stocks sold in July; they sold without notice and without any waiver of notice, thereby making themselves liable. "If a transaction is condemned under the force of legal rules, it cannot receive a more favorable consideration in a court of equity on account of any hardship to particular parties": Bispham's Equity (8th Ed.), P. L. 37, p. 59.

The case calls for reversal. With the data before us that would enable us to determine exactly what amount should be deducted from the claimant's demand, in view of what we have said as to the law, we might end the controversy here; but we have not this data, and it is possible that further testimony will have to be taken to do exact justice between the parties. We have sufficiently indicated what we regard to be the law governing the case, and in order that the case may be disposed of in accordance therewith, we direct a return of the record, and reverse with a procedendo. It is so ordered.