## Fitchthorne v. Barclay, Moore & Co.

*Victor Frey*, for plaintiff; *Layton M. Schoch*, for defendant.

LEWIS, J., July 10, 1930.—Averring that the defendants, with whom he carried a margin account, sold out 6300 shares of the stock standing in said account, "without proper and sufficient notice to the plaintiff that the margin was near exhaustion," and "without reasonable notice of the intention to sell securities," plaintiff seeks to recover damages for the conversion. In their

affidavit of defense the defendants denied any impropriety in the making of the sale, set up an agreement by plaintiff waiving notice of an intention to sell, but alleging that in any event proper notice was given. Under the head of new matter in the affidavit, defendants related that their inability to notify the plaintiff of their intended action was due to his absence from the city and to his failure to follow an itinerary which he had left with them, and the various efforts they made to communicate to plaintiff the change which was taking place in the status of his account are detailed. Most of these are admitted in plaintiff's reply to new matter. On the whole, there is less conflict in the pleadings and testimony than is usual in such cases. The main issues have to do with the contract or understanding subsisting between the parties, with particular reference to the amount of margin required in plaintiff's account; and, everything taken into consideration, whether any notice of the sale of securities was required. A minor issue involves certain stock in plaintiff's account which he says he authorized defendants to hold as additional marginal collateral but which they say it was understood was never included as margin. Plaintiff takes the further position that, conceding defendants' right to have made a sale under the circumstances, the sale of 6300 shares was an excessive sale, and that a sale of one-half that amount would have brought his margin up to the customary point.

From the pleadings, testimony and numerous exhibits we make the following

### Findings of fact.

1. Plaintiff opened an account with the defendant brokerage firm in 1914 or 1915, and thereafter carried a large but relatively inactive account.

2. In January of 1919 plaintiff signed an agreement authorizing the defendants to use any securities in his account in such manner as they might elect so long as he was indebted to them, and particularly giving his consent to a sale without notice of any securities purchased or held as collateral in the account should the security at any time be not satisfactory to defendants. The said agreement contained further provisions as follows:

"And I hereby authorize you whenever demand shall be made upon me by mail or otherwise for the payment of the full purchase price and accrued interest of the securities bought under this order, and said request is not immediately complied with, to sell them as hereinabove provided.

"It is further to be understood, and I hereby agree, that the above mentioned conditions shall apply to all future transactions between myself and the above named firm, whether orders are given verbally or otherwise."

3. Subsequently, in the same year, the plaintiff closed out his account entirely with the defendants and did no business with them whatsoever for a period of more than two years. In September, 1921, he again began to trade through defendants, and continued so to do until the happening of the occurrences now to be related. At no time subsequent to September, 1921, did plaintiff sign a new agreement with defendants.

4. From time to time the defendant firm sent out notices to all customers announcing the margin which would be required for accounts. Prior to 1926 the margin required appears to have been 20 per cent. and in that year it was raised to 25 per cent., and in March, 1923, to 30 per cent.

5. There was no specific agreement between plaintiff and defendant as to the amount of margin which he would be required to maintain in his account, but in numerous margin calls sent out by defendants to plaintiff the rate of margin then being required by defendants in all accounts was invariably mentioned.

6. On or about June 7, 1928, the plaintiff started on an automobile trip to Canada, after having left with defendants a sketchy itinerary, in which he stated that on Friday, June 9th, his address would be in care of L. E. Fichthorn, Southington, Connecticut; on Saturday or Sunday at Mt. Royal Hotel, Montreal, Canada, and on June 14th to 17th in care of H. Huer, No. 226 Wellington Road, Buffalo, N. Y. It was not stated in the itinerary where plaintiff could be reached between June 11th and 14th. On June 12th defendants received from plaintiff a letter dated June 10th from Quebec, Canada, stating that plaintiff would leave for Montreal on the 11th, and proceed from Montreal to Buffalo, where he could be reached on June 13th or 14th.

7. On June 7th plaintiff went to Hartford and while there decided to go to Quebec instead of Montreal and from Montreal to Quebec.

8. On June 9, 1928, there took place a sharp decline in prices in the stock market, and on the same day defendants telegraphed plaintiff that his account needed additional security. This telegram sent to Mt. Royal Hotel, Montreal, Canada, at which plaintiff was supposed to be according to the itinerary. Again, on Monday, June 11th, the defendants telegraphed to the same address that plaintiff's account needed still further security. These telegrams were received by plaintiff on Monday, June 11th, at 7 P. M.

9. On June 12th at various times during the day the defendants made several efforts by telegraph and telephone to communicate with the plaintiff, but were unable to reach him. The defendants called plaintiff's brother at Southington, Connecticut, but plaintiff had left no address; defendants were informed that plaintiff might be reached at Quebec.

10. After a further fall in prices on June 12th, the defendants, at about 10 and 11 o'clock in the evening, sent telegrams to plaintiff at several addresses, notifying him that they would sell in the morning at the opening of the market certain specified stocks. This telegram was received by plaintiff on Wednesday, June 13, 1928, at about noon.

11. Meanwhile, on June 13th, at about 8 o'clock in the morning, the defendants had received from the plaintiff a telegram sent from Rochester, New York, reading as follows:

"Telegram received. Do not sacrifice anything. Will take care of matters as soon as I can get home. Will get in touch with you Wednesday from Buffalo."

12. Orders to sell the stocks specified in defendants' telegram of June 12th were placed by defendants shortly after 9 o'clock on the morning of June 13th, and at the same time plaintiff was wired that it was impossible to delay selling.

13. In accordance with the orders thus given by the defendants, the following stocks standing in the plaintiff's account were sold at the mentioned prices:

| | | | | |
|---|---|---|---|---|
| 500 | shs. | Lee Tire & Rubber | 17⅝ | $4,343.00 |
| 2000 | shs. | Inspiration Copper | 19½ | 19,500.00 |
| 500 | shs. | Granby Cons. | 49⅛ | 12,281.00 |
| 500 | shs. | Texas Pacific Coal & Oil | 13⅛ | 3,281.00 |
| 300 | shs. | Magna Copper | 47 | 7,050.00 |
| 500 | shs. | Nevada Cons. Copper | 21 | 5,250.00 |
| 500 | shs. | Mo., Kans. & Texas Ry. | 30⅝ | 7,656.00 |
| 500 | shs. | Anaconda Copper | 63¼ | 15,812.00 |
| 500 | shs. | Howe Sound | 52 | 13,000.00 |
| 500 | shs. | International Mercantile Marine Pfd. | 36 | 9,000.00 |

14. On the same day, plaintiff was advised that the sale had taken place and immediately protested the same and called upon the defendants to reinstate the account by a repurchase of the sold stocks on or before June 18, 1928.

15. Defendants refused to repurchase any of the stock unless and until plaintiff put up additional collateral. Plaintiff thereupon undertook to repurchase on the dates and at the prices listed below all of the stocks sold except 500 shares Granby and 500 shares Howe Sound:

500 Anaconda .................June 20..............$32,612.50

2000 Inspiration ...............
$\left\{\begin{array}{l}\text{August 22} \\ \text{September 17} \\ \text{October 8} \\ \text{October 15} \\ \text{October 19}\end{array}\right\}$ ........52,912.50

500 Inter. Mer. Mar............June 20..............18,887.50

500 Lee Tire.................$\left\{\begin{array}{l}\text{September 25} \\ \text{October 2}\end{array}\right\}$ ........10,025.00

300 Magna...................$\left\{\begin{array}{l}\text{June 14} \\ \text{June 26}\end{array}\right\}$ ............15,085.00

500 Mo., K. & T................June 14..............16,825.00

500 Nevada Cop...............June 27..............11,450.00

500 Tex. P. C. & O............ ..October 19.............8,400.00

16. If plaintiff had repurchased all of the said stocks within thirty days after June 18, 1928, he could have done so at the following outside prices:

2000 Inspiration at 22⅝...............................$45,250.00

500 Lee Tire at 20⅜, would have been substantially what
he actually did pay at a later date, to wit............ 10,025.00

500 Texas P. C. & O. at 14⅞.......................... 7,438.00

500 Granby at 54⅞.................................... 27,438.00

500 Howe Sound at 60⅜.............................. 30,188.00

The other stocks, to wit, 500 Anaconda, 500 Inter. Mer. Mar., 300 Magna, 500 M. K. & T., and 500 Nevada Cop., were actually purchased within thirty days, and as to these the actual cost to plaintiff as set forth in finding fifteen should be taken.

17. On the basis of repurchases within thirty days after June 18th, the total cost to plaintiff would have been $215,199, which exceeded the proceeds of the defendants' sale of $192,807.50 by $22,391.50.

18. The plaintiff's margin with defendants during the days under consideration was as follows: June 7th, 29 per cent.; June 8th, 25.4 per cent.; June 9th, 25.2 per cent.; June 11th, 21.3 per cent.; June 12th, 17.3 per cent.; June 13th, 31.8 per cent.; June 14th, 29.3 per cent.

19. The 2900 shares of American Ship & Commerce stock were held as collateral security by defendants for plaintiff's indebtedness to them, but not as marginal collateral, because of the price at which said stock was selling, and so should not be included in any calculation as to plaintiff's margin.

### Discussion.

The first point to be determined is whether the customer's agreement signed by the plaintiff in 1919 was in effect in June of 1928. Much space is devoted in the briefs of counsel to the effect of the change in the personnel of the defendant partnership during the period that the plaintiff had withdrawn his account. We think it unnecessary to decide the question on that ground, for we have come to the conclusion that the agreement regarding plaintiff's contract rights with the defendants did not remain in force and effect after the relations between the parties had been altogether discontinued for a period of more than two years. It is true that the agreement contained the provision that it was to apply to all future transactions between the parties, but

we are not convinced that this was intended to refer to transactions following a complete severance for two years of all business relations between the parties. Possibly the defendants were misled by the provision in the old agreement and were under the impression that it was in force and effect, but good business practice would dictate, under circumstances here present, the execution of another agreement.

In the absence of such an agreement affecting the situation so far as defendants' right of sale of securities held in the account is concerned, the defendants clearly had no right to sell except upon notice given of the intention to do so. It is not sufficient that defendants should call for additional margin and allow a reasonable time for furnishing same, but they must also give reasonable notice of intention to sell: Diller *v.* Brubaker, 52 Pa. 498; Esser *v.* Linderman, 71 Pa. 76; Learock *v.* Paxson, 208 Pa. 602; Berberick's Estate, 257 Pa. 181; Sanger *v.* Price, 114 App. Div. 78. Here it is admitted that the first notice given by defendants of their intention to sell was sent out late in the evening of June 12th. The notice, moreover, was sent to Buffalo, despite the fact that defendants had received, earlier on the same day, a telegram from plaintiff at Rochester. We lay no emphasis, however, on the matter of places to which defendants sent notice, for, as will be discussed hereafter, most of the blame in this regard rests on the plaintiff because of the careless manner in which he handled the situation. Even if plaintiff had been in Buffalo, the place to which the notice of intention to sell was directed, he would not have received the telegram until nearly midnight, assuring it would have been delivered to him at that time; the probabilities are that it would not have been delivered to him until the next morning. This would have given him perhaps less than one business hour within which to protect himself. After careful consideration and an examination of the cases in Pennsylvania, we have reached the conclusion that this was not the reasonable notice of intention to sell to which the plaintiff was entitled.

On the other hand, it is clear that all of the confusion regarding the plaintiff's exact whereabouts was due to his change of plans. The defendants took every possible means of communicating with him, particularly on June 12th. While there is no evidence that they intended, had they located him on that day, to communicate to him their intention to sell if he did not immediately furnish further margin, we think the situation somewhat different from the usual one in which brokers proceed to a sale without notice. These defendants were hampered in their communications with the plaintiff because of the situation which the plaintiff himself had created. This should, in our view, be taken into account in considering the matter of damages.

At the trial and in his brief, plaintiff made the contention that he is entitled to receive, as damages, the difference between the highest price at which the stocks sold between the date of the sale and the date of trial and the actual proceeds received from the sale. This would bring the damages to very large figures indeed—in fact, to two and one-half times the amount of his claim as contained in the pleadings. All of plaintiff's actions point clearly to an election on his part to reinstate his account. He repurchased many of the stocks within a few weeks of the sale, and within several months replaced all he ever did replace. His claim, as contended in his statement, would appear to be one based on the loss which he sustained by reason of having to repurchase the stocks.

Chief Justice Moschzisker has given us in Gervis *v.* Kay et al., 294 Pa. 518, not only a characteristically thorough opinion on this general subject, but one which we think is particularly helpful here. In that case the sale by the

defendant brokers occurred as a result of a misunderstanding and was altogether without wrongful intent; under these circumstances, it was felt that the usual rule of allowing as damages the highest market value prevailing between the date of conversion and the date of the trial "did not reach the justice of the situation presented by the evidence." The court applied, therefore, what it referred to as the New York rule that upon being informed of the sale the customer had the right to disaffirm it and require defendants to replace the stock, failing or refusing which the customer could do it himself and charge them with the loss reasonably sustained in doing so; the advance in the market price of the stock from the time of the sale up to a reasonable time to replace it, after plaintiff received notice of the sale, would afford a complete indemnity.

We are well aware of the usual rule in this jurisdiction as to damages for conversion by a broker of stock belonging to a customer; a splendid discussion of it is to be found in 77 University of Pennsylvania Law Review, at page 682, in which the conclusion is reached that while the decision in Gervis v. Kay is expressly limited to conversion by honest mistake, the rule should be extended to all cases involving conversion of shares of stock. Indeed, this has now been accomplished through the Act of April 10, 1929, P. L. 476—which, however, does not apply to this proceeding. As in Gervis v. Kay the court took into consideration the fact that the sale came about through an honest misunderstanding, so here we think it should be kept in mind that the plaintiff was in part responsible for the situation, in that he did not undertake to keep the defendants informed of his address. Such neglect, however, did not altogether excuse the defendants from sending out a notice a reasonable time before the intended sale. Instead, they wired him at a time which gave the defendant less than one hour in which to safeguard himself, and this as a matter of law is insufficient.

Plaintiff called upon defendants to replace the stocks at or before noon of June 18th. They did not do so. He immediately began to replace them himself. We have concluded that thirty days would have been sufficient for this purpose, in that it would have given him sufficient time within which to consult counsel, study the market and determine the best time and price to make the purchases. On such a basis he could have made the repurchases for the prices given in the findings of fact above, and we believe that justice will be done in this case by allowing him damages in that amount. Plaintiff contends that the several months during which he actually was reacquiring the stock should be taken to be the reasonable time contemplated by the law, but with this we cannot agree. We are of opinion that thirty days would have been ample. See Colt v. Owens, 90 N. Y. 368.

In the Gervis case, the Chief Justice said (page 525):

"The customer is not obliged to reacquire like stock, but he is obliged, as in other cases, to minimize his damages, and if he can do this by again purchasing stock of the kind converted, the case must be treated as though he had, at the proper time, followed that course, and thereby put himself in a position to reap the benefits of such ownership."

Under the authority of the same case, the plaintiff is entitled to interest on his loss as compensation for delay.

The trial judge was somewhat impressed at the time of the hearings with the contention that the defendants sold an excessive amount of stock. At that time it appeared from some of the values as though the sale resulted in bringing plaintiff's margin up to more than 40 per cent. A further study of the values shows that the margin was increased to something between 31 per

cent. and 35 per cent. In view of the unstable condition of the market, we now doubt whether the sale was excessive, but in any event we prefer to place all of the stock in the same category as above outlined.

### Conclusions of law.

1. The customer's agreement signed by the plaintiff in 1919 did not remain in force and effect when plaintiff resumed relations with the defendant firm in September, 1921, in view of the lapse of more than two years and the changed personnel of the brokerage firm.

2. The plaintiff was entitled to reasonable notice of the defendants' intention to sell stocks standing in his account.

3. The notice sent out to plaintiff late in the evening of June 12th, of an intention to sell at the opening of the market the following day, was not reasonable notice under the circumstances, and the sale of plaintiff's stocks held in accordance with said notice was accordingly wrongful and one which rendered the defendants liable in damages to the plaintiff.

4. The plaintiff having undertaken to repurchase the stocks, he should receive as damages the difference between the highest prices at which he could have reacquired the stocks within a reasonable time after notice of the wrongful sale and the actual proceeds of the sale held.

5. Under the circumstances of this case, thirty days after the date of defendants' final refusal or failure to repurchase the stock was a reasonable time within which plaintiff could himself have made the repurchases.

6. The plaintiff is entitled to interest on his loss as compensation for delay.

7. The plaintiff is entitled to a judgment in the sum of $22,391.50, with interest thereon from July 18, 1928, amounting to $2627.25.

Notice of the above decision shall be forthwith given by the prothonotary to the parties or their attorneys, and if no exceptions thereto are filed in the proper office within thirty days after service of such notice, judgment shall be entered thereon by the prothonotary.