## A. J. CONOLLY v. HERBERT I. FOSTER AND OTHERS.[1]

April 15, 1932.

No. 28,610.

*O'Brien, Horn & Stringer* and *Caruthers Ewing,* for appellants.
*T. W. McMeekin, John J. Courtney,* and *Arthur Stewart,* for respondent.

OLSEN, J.

Defendants appeal from a judgment in plaintiff's favor for $37,250.02.

The errors assigned are that the court erred in not directing a verdict in favor of defendants and in denying defendants' motion for

[1]Reported in 242 N. W. 334.

judgment in their favor notwithstanding the verdict. If at the close of the evidence there was not sufficient evidence to take the case to the jury, or if the evidence conclusively showed that plaintiff was not entitled to recover, then it was error not to direct a verdict for defendants and error not to grant judgment notwithstanding the verdict.

■ The defendants are copartners engaged in the stock brokerage business under the firm name of Paine, Webber & Company. They are members of the New York Stock Exchange and other exchanges, and maintain branch offices in St. Paul, Duluth, and other cities. Plaintiff traded in stocks and bought stocks on margin. For several years prior to the fall of 1924 he conducted his sales and purchases at the Duluth office of defendants and had an account in that office. About that time plaintiff removed to St. Paul. He then transferred his account and his margin securities to the defendants' St. Paul office. He was a friend of Mr. Byrne, the manager of the St. Paul office. Before he transferred his account he had signed and delivered to defendants, at their Duluth office, the usual signature card of brokers' customers. The card contained the usual agreement that the brokers, Paine, Webber & Company, might at any time sell the stocks held as margin, without notice, whenever their market value did not exceed 105 per cent of the debt secured thereby. This card remained at the Duluth office until this action was brought. It is difficult to see how the fact that this card was never transferred to the St. Paul office has any importance. It remained in the hands of defendants at all times and stated the terms on which they were acting for plaintiff. There was no interruption in the relation of the parties or in the transactions between them by the transfer of the account from one office to the other. Plaintiff testified that in 1927 he was asked to sign such a card at the St. Paul office and refused. Such request presumably was made because the employe in the St. Paul office who made it did not know that defendants already had such a card in their possession.

There is evidence that during all his dealings with defendants, whenever purchases of stock were made for plaintiff, he received

written report thereof upon which was contained the printed notice and conditions that plaintiff was to keep good a satisfactory margin, and that defendants, whenever they deemed it necessary for their protection, should have the right in their discretion to close the account by sale of the securities, without notice or any demand for more margin.

Plaintiff testified that at the time he transferred his account to the St. Paul office, he said to his friend Mr. Byrne:

"If I open this account here I expect to trade quite a bit, and it will be an open account. Now, in regard to the matter of protection, marginal requirements and so on, I will expect ample protection from you and your company in this St. Paul office"; and Byrne said: "Al, you can absolutely depend upon that. Any time your account needs bolstering I will give you ample time to protect yourself." Plaintiff then said: "That is fair enough. I will have the account transferred."

From the time his account was transferred to the St. Paul office plaintiff continued to trade actively in stocks. The stock market crash came during the last week of October, 1929. At the close of the market on October 28 plaintiff owed defendant on open account $492,000 in round numbers. Defendants held stocks as margin in this account of the then market value of about $155,000 over and above this debt. The principal value of the stocks held as margin consisted of 11,084 shares of Stewart-Warner stock, which had closed at $47 per share. On the morning of October 29 the market price of Stewart-Warner stock suddenly dropped to $31 per share, showing a loss of over $177,000. There were declines in all other stocks held as margin, so that on that morning plaintiff's margin was some $47,600 less than what he owed the defendants.

Plaintiff was an experienced stock trader. He was promptly informed on the morning of October 29 of the crash in stock prices and that Stewart-Warner stock was down to $31 per share. He denies that he was told that his account was "under water," that is, that the value of his margin was below his indebtedness. He admits that he was told his account was in bad shape, that something

should be done, and that there was talk about selling some of the Stewart-Warner stock. A simple mental calculation on his part, which he was fully competent to perform, no doubt informed him at once that there was a depreciation of over $177,000 in the value of his Stewart-Warner stock and that his account was "under water." What he did, as testified by him, was to authorize the sale of 500 shares of Stewart-Warner stock at $32 per share. This would not have appreciably benefited his account. If he had sold all of his Stewart-Warner stock at $32 his account would still have been "under water." The only effect of selling 500 shares, or any shares, would be to protect the stock sold from further depreciation. Knowing as he did that his Stewart-Warner stock had so depreciated that his account was "under water," we think it was incumbent on the plaintiff promptly to do something more than authorize the sale of 500 shares—an empty ceremony so far as restoring the depleted margin. The only way the account could have been bettered at that time would be by paying in more margin, either in cash or additional securities. Plaintiff denies that any call was made on him for further margins, but it is apparent that the object of Mr. Byrne in calling him that morning was to have something done to take care of the account. Plaintiff had already received the market report from another employe in the office before Mr. Byrne called him. Opportunity to protect his account was given him on the morning of October 29, as shown, and he failed to do so then or thereafter.

Whether the talk between plaintiff and Mr. Byrne at the time the account was transferred to the St. Paul office modified the contract between the parties and entitled plaintiff to notice and opportunity to protect his account is a close question. But if it did, prompt action on the part of the plaintiff, when he was informed that his account was in bad shape and below requirements, was nevertheless necessary. Stock transactions of this kind, where large amounts are involved and on a fluctuating market, require very prompt action. By a sudden and decisive drop in market values an emergency is created, and almost immediate action is required. Minnesota L. O. Co. v. Collier W. L. Co. 4 Dill. 431,

12

17 Fed. Cas. p. 447, No. 9635; Schaefer v. Dickinson, 141 Ill. App. 234.

■ Defendants commenced to sell plaintiff's Stewart-Warner stock on October 29 and sold all of it on October 29 and 30. It was sold in small lots not exceeding 500 shares each, in a fluctuating market in which there was some recovery from the price of $31 per share. The average price obtained was $38⅞ per share. This resulted in a balance in plaintiff's favor of $49,552.95 over and above his indebtedness to defendants, taking into account the market value of the other securities held in the account as of October 30. Plaintiff was informed on October 30 that some 4,400 shares of his stock had been sold and that all of it had been ordered sold. He said he had not authorized such sale and wanted to know who had ordered the sale. Mr. Byrne stated he had. Plaintiff then directed Byrne to cancel the order to sell any more stocks. This was in the afternoon of that day, and either all the stock had already been sold or the direction to sell no more stock was not carried out.

On November 4 plaintiff was furnished a report of all sales made. On November 11 he was furnished a full statement of his account. There was an error in this account as to the price received on one sale, afterwards rectified. On December 7 plaintiff asked for and received from defendants $10,000 in cash (by check) and ordered defendants to transfer his account to Farnum, Winter & Company, another brokerage firm. This was done by delivering to Farnum, Winter & Company some 1,700 shares of stock, other than Stewart-Warner stock, then held by defendants in the account, and paying to that company a balance of $4,361.88. The cash so paid to plaintiff and the cash and stocks turned over to Farnum, Winter & Company discharged the $49,552.95 credit which plaintiff had in his account with defendants at the close of business on October 30, except the one item of error in the account before mentioned, which was thereafter paid.

From October 30, when plaintiff learned of the sale of his stock, until December 7, he permitted the account to stand as it was. He

made no demand on defendants or any repudiation of the sales. He testified that he intended to hold the stock as an investment and had no intention of selling it. Had plaintiff continued to hold the stock, as he says he intended to do, he would have suffered the same consequences as owners of stocks generally suffered who continued to hold their stocks.

Ratification means confirmation; to approve or sanction a previous unauthorized act done in behalf of the one ratifying. Each case depends upon the facts and the character and nature of the subject matter. These parties were dealing in a specialized and hazardous business. The defendants so handled the business that by the close of October 30, in the midst of wild market fluctuations, plaintiff's account was changed from a liability of $47,666.72 to a credit of $49,552.95. All this was known to plaintiff when he received the statement of his account on November 11. He remained silent thereafter until this action was brought on December 9. He availed himself of the improved condition of his account, and when at his order the account was transferred, he owned outright some $15,000 in money and securities of the value of more than $34,000, and accepted this money and the securities.

On November 13 and 14 Stewart-Warner stock could have been purchased in the market for substantially less than the amount plaintiff received from the sale on October 29-30. The identical shares have no significance. Had plaintiff on November 11 or 12 promptly repudiated the sale made, defendants could have repurchased the same number of shares at a substantial profit to plaintiff.

In Clews v. Jamieson, 182 U. S. 461, 484, 21 S. Ct. 845, 854, 45 L. ed. 1183, 1194, it is said:

"The failure of the complainants to repudiate the action of their agents in the sale immediately after it was reported to them would operate as a ratification." This was a sale by brokers of shares of stock.

See also Robbins v. Blanding, 87 Minn. 246, 91 N. W. 844; Guy T. Bisbee Co. v. Granite City Inv. Corp. 159 Minn. 238, 199 N. W. 14; Leviten v. Bickley, M. & W. Inc. (C. C. A.) 35 F. (2d) 825;

Burnham v. Lawson, 118 App. Div. 389, 103 N. Y. S. 482; Violett v. Horbach, 119 App. Div. 373, 104 N. Y. S. 249; Smith v. Hutton, 138 App. Div. 859, 123 N. Y. S. 656, 203 N. Y. 594; Manning v. Heidelbach, 153 App. Div. 790, 138 N. Y. S. 750; Schaefer v. Dickinson, 141 Ill. App. 234; Lunn v. Guthrie & Boyle, 115 Iowa, 501, 88 N. W. 1060.

We hold as a matter of law that by his failure to act and to repudiate the sale of his stock for some four weeks' time, and by accepting the proceeds of such sale, under the circumstances shown, plaintiff ratified the sale and cannot now recover.

Judgment reversed with directions to cause judgment to be entered for the defendants.

Holt, J. (dissenting).

I dissent. The majority opinion virtually concedes that it was for the jury to say whether plaintiff traded with defendants in their St. Paul office under the oral agreement he made with Mr. Byrne, defendants' manager there. Plaintiff testified that the only arrangement he made with Byrne was this:

"If I open this account here I expect to trade quite a bit, and it will be an open account. Now, in regard to the matter of protection, marginal requirements and so on, I will expect ample protection from you and your company in this St. Paul office." To which proposition Byrne responded: "Al, you can absolutely depend upon that. Any time your account needs bolstering I will give you ample time to protect yourself."

That they acted under this oral agreement is evidenced by the fact that when the market broke on October 29 Byrne telephoned plaintiff, who was ill at home, to lighten somewhat on his Stewart-Warner stock, pledged with other stock for margins. It was then agreed that 500 shares should be sold, and Byrne did sell and at once report for $32 a share. The market rose thereafter on that day to $37 at noon, but fell in the afternoon, closing at $31¼. The next morning it opened at $34, rose to $39 before noon, and closed at $44⅞. On the 31st it advanced to over $50. The jury found

by their verdict that there was a conversion; but evidently determined the damages as of the 30th, the day when plaintiff was first informed of the unauthorized sale and when he emphatically repudiated the same. It would appeal to anyone that plaintiff ought to have as damages for conversion the highest price reached by the stock on the day of its conversion. The rule applied, known as the New York rule, is:

"The rule is that a person whose stocks have been converted is entitled to a reasonable time after notice of the conversion within which to determine whether he will purchase other stocks in the place thereof and that he may use as a basis for his claim of damages resulting from the conversion the highest prices which have prevailed during such reasonable period." Mayer v. Monzo, 221 N. Y. 442, 446, 117 N. E. 948, 950.

A few cases only need be cited following this rule. McKinley v. Williams (C. C. A.) 74 F. 94; Wilson v. Colorado Min. Co. (C. C. A.) 227 F. 721; Galigher v. Jones, 129 U. S. 193, 9 S. Ct. 335, 32 L. ed. 658; Newburger Cotton Co. v. Stevens, 167 Ark. 257, 267 S. W. 777, annotated 40 A. L. R. 1279, 1282; Vos v. Child, Hulswit & Co. 171 Mich. 595, 137 N. W. 209, 43 L.R.A.(N.S.) 368; Gervis v. Kay, 294 Pa. 518, 144 A. 529, annotated 63 A. L. R. 297, 305; Western Sec. Co. v. Silver King Cons. Min. Co. 57 Utah, 88, 192 P. 664. See also Hall v. Paine, 224 Mass. 62, 112 N. E. 62, 112 N. E. 153, L. R. A. 1917C, 737, which suggests that the verdict rendered might be justified even under the rule prevailing in that state.

The jury also had a right to find that plaintiff when he first learned of the conversion at once repudiated the deal. It could accept plaintiff's testimony as true, that at about noon on the 30th he was telephoned that defendants had sold 4,400 shares of the Stewart-Warner stock, and he at once demanded to know upon whose order, and was told upon Byrne's. He was connected with Byrne and said to him:

"Man, that stock is rising! Why sell it without my authority? You cancel immediately any unsold orders on any stock still unsold.

'Well,' he said: 'I don't know, it may be too late, but I will wire them anyway to cancel selling orders.' 'Now,' I said, 'I rely on that, and you let me know.' "

Byrne did not let plaintiff know, but contrary to his promise did, during the afternoon of the 30th, give several selling orders of this stock in blocks of 500 shares.

It seems to me the jury could, from the above, find that a definite repudiation occurred on the 30th of October. And there being once such repudiation, it might well be found that what thereafter transpired in the way of statements of account, receiving back the remnants of the money and stock, and directing it to be transferred to another bróker did not render the repudiation nugatory or amount to a ratification of the unauthorized sale or conversion. It is plain that the transfer to another broker was because plaintiff considered his boyhood friend, Byrne, had wronged him. This issue of ratification by the rendering of a statement, by drawing some money, by transferring the account to another broker, and by acquiescence was submitted so fairly and clearly to the jury that no fault is found with the language in which it was submitted. And taking the evidence as a whole, I am convinced that the issue was for the jury and not for the court. The cases cited in the majority opinion involve agents and principals, where an agent or broker has undertaken to buy or sell stock for immediate or future delivery and some question arises as to his authority. A principal, when he learns that his agent or broker has dealt in his behalf, must at once repudiate the transaction if he considers it to have been unauthorized. Mere silence after full knowledge of the purported act of his agent, or the acceptance of any benefit therefrom, will ratify or adopt the transaction.

It seems to me the conversion of pledged stock stands on a different basis, in this, that the acceptance or recovery of some of the stock or of some of the proceeds of the unlawfully converted stock does not as a matter of law approve the conversion. Not to speak of the immediate repudiation as testified to by plaintiff herein, if defendants were guilty of conversion and were informed by plaintiff

that he would not sanction it on the day it took place, defendants are not now in a good position to insist that plaintiff has lost his rights by what has occurred subsequent to the repudiation. Berberich's Estate, 257 Pa. 181, 101 A. 461. 26 R. C. L. § 58, p. 1145, speaking of estoppel—which may be said to be a legal consequence of ratification—states:

"However, the mere receipt of the proceeds derived from an unauthorized sale of the plaintiff's property will not necessarily estop him from treating such act as a conversion. Even though he knows of the sale at the time of such receipt, it must be remembered that he is entitled to compensation by reason of the conversion and he may therefore treat such payment as part compensation for his loss."

The same thought is expressed in Allen v. American B. & L. Assn. 49 Minn. 544, 52 N. W. 144, 32 A. S. R. 574; Hughes v. Barrell, 167 Ill. App. 100.

I think the evidence justified a submission of all the issues to the jury and supports the verdict rendered.

DIBELL, J. (dissenting).

I concur in the views of Mr. Justice Holt, and therefore I dissent from the prevailing opinion.

HILTON, J. (dissenting).